**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **ALAN GARCIA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )    **Case No. 24-cv-10762-DJC** |
| | ) |
| **UNITED PARCEL SERVICE, INC. and** | ) |
| **TEAMSTERS UNION LOCAL No. 59,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| | ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    **February 13, 2025**

### I.    Introduction

Plaintiff Alan Garcia ("Plaintiff") has filed this lawsuit against Defendants United Parcel Service, Inc. ("UPS") and Teamsters Union Local No. 59 ("Local 59") (collectively, "Defendants") alleging discrimination and retaliation under Mass. Gen. L. c. 151B. Both Defendants have moved for judgment on the pleadings, or in the alternative to dismiss, D. 31; D. 37. For the reasons stated below, the Court ALLOWS the motions.

### II.    Standard of Review

Rule 12(c) allows a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is "ordinarily accorded much the same treatment" as a Rule 12(b)(6) motion. Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54 (1st Cir. 2006). To survive a motion for judgment on the pleadings, therefore, a plaintiff must plead

"enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Because a motion for judgment on the pleadings "calls for an assessment of the merits of the case at an embryonic stage," the Court "view[s] the facts contained in the pleadings in the light most favorable to the nonmovant and draw[s] all reasonable inferences therefrom" in his favor. Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (internal citation and quotation marks omitted).

On a Rule 12(c) motion, unlike a Rule 12(b) motion, the Court considers the pleadings as a whole, including the answer. See Aponte-Torres, 445 F.3d at 54–55. Those assertions in the answer that have not been denied and do not conflict with the assertions in the complaint are taken as true. See Santiago v. Bloise, 741 F. Supp. 2d 357, 360 (D. Mass. 2010). In addition, "[t]he court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice." R.G. Fin. Corp. v. Vergara-Nuñez, 446 F.3d 178, 182 (1st Cir. 2006). Still, "[l]ike Rule 12(b)(6), Rule 12(c) does not allow for any resolution of contested facts; rather, a court may enter judgment on the pleadings only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment." Aponte-Torres, 445 F.3d at 54 (citation omitted).

## III.    Factual Background

Unless otherwise indicated, the following summary is based upon the allegations in the complaint, D. 1-1, the undisputed facts in UPS and Local 59's answers, D. 10; D. 6, and the Collective Bargaining Agreement ("24") attached to UPS's answer, D. 10-1; D. 10-2.[1] The Court also considers the Massachusetts Commission Against Discrimination's ("MCAD's") Order in

---

[1] According to Federal Rule of Civil Procedure 10(c) "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c); see D. 25 at 2.

2

Garcia's proceedings against UPS and Local 59 before the MCAD, D. 30-1, because "[i]t is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand."  Maher v. Hyde, 272 F.3d 83, 86 n.3 (1st Cir. 2001) (quoting Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990)).

Garcia is a bi-racial man of Cape Verdean descent.  D. 1-1 ¶ 1.  On August 26, 2002, he began working for UPS part-time as a pre-loader at the Sagamore, Massachusetts facility.  Id. ¶ 4; D. 6 ¶ 4; D. 10 ¶ 4.  From this date forward, Garcia was a dues-paying member of Local 59, which acted as his designated bargaining unit as a UPS employee.  D. 1-1 ¶¶ 3, 8; D. 6 ¶¶ 3, 8; D. 10 ¶¶ 3, 8.  Garcia held his part-time position until March 28, 2006, when he became a driver at the UPS Martha's Vineyard facility.  D. 1-1 ¶ 5; D. 6 ¶ 5; D. 10 ¶ 5.  Next, he worked out of the Dartmouth facility.  D. 1-1 ¶ 5; D. 10 ¶ 5.  Garcia continued to drive for UPS until his employment was terminated on or about December 8, 2020.  D. 1-1 ¶ 7; D. 10 ¶ 7.

### A.    Allegedly Discriminatory Statements by Garcia's Supervisor

Garcia alleges racial slurs were used in the workplace.  D. 1-1 ¶¶ 10–17.  Specifically, upon learning he was bi-racial, Bill Connors, one of Garcia's supervisors, allegedly told him, "[s]o you're like a [z]ebra," and laughed.  Id. ¶¶ 10–11.  Garcia later reported this incident to the UPS Center Manager of the Dartmouth facility, Jeffrey Mello, who allegedly responded "that's just Bill being Bill."  Id. ¶ 12.  When Garcia separately reported this incident to George Belanger, his then Local 59 Representative, Belanger allegedly told him nothing would be done.  Id. ¶ 13.  On a separate occasion, after Connors learned a black employee was transferring into the Dartmouth facility he allegedly said "[n]ot for long, I'm going to fire his black ass again."  Id. ¶ 14.  Mello apparently laughed after Connors made this comment.  Id.  Garcia alleges he found these comments "wearing and hurtful."  Id. ¶ 17.

3

### B.    <u>Route Assignments</u>

On or about early 2020, Garcia allegedly raised concerns to senior management at UPS's Dartmouth facility and to Local 59 that minority UPS drivers were disproportionately assigned to predominately minority neighborhoods, while white UPS drivers were assigned to predominately white neighborhoods.  <u>Id.</u> ¶ 18.  Garcia alleges that neither UPS nor Local 59 investigated or addressed his concerns.  <u>Id.</u> ¶¶ 20–21.

Route assignments are governed by the CBA in place between Local 59 and UPS.  <u>See</u> D. 10-1; D. 10-2.  The CBA proscribes a seniority system, assigns driver roles, routes and hours and creates a system of bidding and bumping rights.  <u>See</u> D. 10-1 at 82–84; D. 10-2 at 15–31; D. 31 at 6.  Drivers are assigned one of several classifications and generally only one classification of drivers, Regular Package Car Drivers ("RPCDs"), have a "bid" route (an assignment with set "starting times [and a] general area of the route").  D. 10-1 at 82–84; D. 10-2 at 15–23.  Qualified drivers bid for these routes "in the order of their seniority."  D. 10-2 at 15–23.  Exceptions to driving assignments exist for several reasons, including but not limited to transfer, vacation, vacancy and route elimination.  D. 10-2 at 26–31.

### C.    <u>Union Election</u>

In May 2020, Garcia alleges he filed a petition to run for the position of Shop Steward within the bargaining unit of UPS's Dartmouth facility.  D. 1-1 ¶ 22.  Stewards monitor and enforce the collective bargaining agreement ("CBA") in place between Local 59 and UPS by investigating workplace issues, bringing formal grievances to management's attention and representing other members of the collective bargaining unit.  <u>Id.</u> ¶ 23; D. 6 ¶ 23; D. 10 ¶ 23.  Pursuant to the requirements of the CBA, Garcia alleges he obtained signatures of at least 51% of the bargaining unit members.  D. 1-1 ¶ 24; D. 6 ¶ 24.  Upon receiving Garcia's petition, Belanger allegedly told

Garcia that "he would hold an election when he got to it," D. 1-1 ¶ 25, and ultimately held the election four months later in October 2020, id. ¶ 28; D. 6 ¶ 28. Garcia alleges that during his tenure at UPS, elections for Shop Steward were typically held within the month that a petition was filed. D. 1-1 ¶ 26. Belanger blamed COVID-19 for the delay, even though, as alleged, "operations at the UPS facility remained largely unaffected by the virus." Id. ¶ 29. Garcia won the election against an incumbent, white candidate, Todd Orton. Id. ¶¶ 27, 30.

    **D.**    **Investigation**

    After Orton lost the election, he reported Garcia to UPS management for sexual harassment for creating inappropriate memes. Id. ¶ 31; D. 6 ¶ 31. Garcia had started creating memes one year prior with his coworker, Aaron Chisholm. D. 1-1 ¶ 31. Their first meme allegedly portrayed Mello holding a baby with Chisholm's face and included the caption, "[w]ho's your daddy?" Id. ¶ 32. On or about mid-2019, Garcia alleges he saw Chisholm and another coworker show Mello the meme and Mello apparently laughed and said he thought it was humorous. Id. ¶¶ 32–33. At the time, neither Chisholm nor Garcia were disciplined for creating the meme. Id. ¶ 34. Chisholm then showed Garcia how to create memes using a phone application and provided Garcia with photographs of UPS employees. Id. ¶ 36. Garcia used this application to create memes of Mello and shared them with Chisholm, Orton and several other UPS employees. Id. ¶¶ 37–39; D. 6 ¶¶ 37–39.

    After Orton's report, UPS investigated Garcia and Chisholm's creation and distribution of memes. D. 1-1 ¶ 40; D. 6 ¶ 40; D. 10 ¶ 40. On or about December 1, 2020, members of UPS management and UPS security interviewed Garcia about the memes. D. 1-1 ¶ 42; D. 6 ¶ 42; D. 10 ¶ 42. Belanger was present as Garcia's Local 59 representative. D. 1-1 ¶ 42; D. 6 ¶ 42; D. 10 ¶ 42. In this interview, Garcia apologized for his behavior, described it as "childish," offered to

apologize to others and volunteered to resign as Shop Steward.  D. 1-1 ¶ 42; D. 6 ¶ 42; D. 10 ¶ 42.
On or about December 8, 2020, Garcia and Chisholm were terminated.  D. 1-1 ¶ 44; D. 6 ¶ 44; D. 10 ¶ 44.

      **E.**      **<u>Local 59 Grievance Process</u>**

The CBA vests ultimate employment decision-making authority in a grievance-arbitration process.  D. 10-1 at 29–38; D. 10-2 at 9–10, 32; D. 25 at 4–5.  Consistent with this process, after Garcia and Chisholm were terminated, Local 59 grieved both terminations.  D. 1-1 ¶ 45; D. 6 ¶ 45; 10 ¶ 45.  Their grievances were submitted to two separate panel hearings, each of which consisted of three non-UPS employees and three members of the collective bargaining unit.  D. 1-1 ¶ 46; D. 6 ¶ 46; D. 10 ¶ 46.  Despite his prior disciplinary history, <u>see</u> D. 1-1 ¶ 35; D. 6 ¶ 35; D. 10 ¶ 35, Chisholm's grievance was resolved in March 2021 and he returned to work at the UPS Dartmouth facility, D. 1-1 ¶ 47; D. 10 ¶ 47.  Chisholm's punishment had been a three-and-a-half-month unpaid suspension and he was further required by UPS and Local 59 to complete sensitivity training.  D. 1-1 ¶¶ 47–48.  Garcia attended his panel hearing in May 2021, took responsibility for his conduct and apologized.  <u>Id.</u> ¶ 56.  UPS and Local 59 denied Garcia's grievance and upheld his termination, allegedly citing his lack of remorse.  <u>Id.</u> ¶¶ 57–58; D. 6 ¶¶ 57–58; D. 10 ¶¶ 57–58.

Garcia alleges he was subject to differential treatment based upon his race, <u>see</u> D. 1-1 ¶ 57, and asserts UPS and Local 59 had, on another occasion, subjected a minority employee to such differential treatment, <u>id.</u> ¶¶ 52–55.  Specifically, during the pendency of Garcia's grievance, two UPS employees were accused of sexual assault.  <u>Id.</u> ¶ 52; D. 10 ¶ 52.  As alleged, one of the accused employees was white, the other accused employee was a minority.  D. 1-1 ¶ 52.  As alleged, both employees were initially terminated, but the white employee was reinstated with back pay and benefits while the black employee was not reinstated.  <u>Id.</u> ¶ 54.

### F.    MCAD Order

In his briefing related to this Court's show cause order, Garcia noted that on September 17, 2021, he filed a complaint against UPS and Local 59 in the MCAD "alleging discrimination on the basis of national origin, race, and color under state and federal antidiscrimination laws."  D. 30 at 4.  It appears that the proceedings before the MCAD concerned Garcia's allegations regarding UPS and Local 59's failure to reinstate him following his termination.  See D. 30-1 at 1–2.[2]  The MCAD does not appear to have considered allegations regarding the use of racial slurs in the workplace, racially motivated route assignments and the delay of the union election.  See id.  On April 25, 2022, Local 59 moved to dismiss the proceedings before the MCAD on the ground that the MCAD lacked jurisdiction because the claim before it was preempted by federal law.  Id. at 1.  The MCAD denied that motion, concluding that resolution of the claim before it "[did] not depend upon the meaning of the collective-bargaining agreement."  Id. at 3.

## IV.    Procedural History

Garcia instituted this action on January 24, 2024 in Bristol Superior Court.  D. 1-1.  UPS then removed this action to this Court with Local 59's consent.  D. 1.  At a May 20, 2024 scheduling conference, the Court ordered UPS to file briefing to show cause for removal.  D. 22.  UPS complied with this order, D. 25, Garcia filed a response, D. 30, and UPS and Local 59 have now moved for judgment on the pleadings under Federal Rule of Civil Procedure ("Rule") 12(c), or in the alternative, for dismissal under Rule 12(b)(c), D. 31; D. 37.  The Court heard the parties on the pending motions and took these matters under advisement.  D. 48.

---

[2] None of the parties attached any other materials related to the MCAD action to their papers.

## V.    Discussion

### A.    <u>Issue Preclusion</u>

Garcia suggests Local 59 is precluded from re-litigating the issue of LMRA preemption because the MCAD "previously rejected this identical argument." D. 41 at 1–4. The overarching guiding principle for Massachusetts courts' evaluation of issue preclusion is whether the party against whom the defense is asserted had the "full and fair opportunity to litigate the issue in the first action." <u>Martin v. Ring</u>, 401 Mass. 59, 62 (1987) (citation omitted). Issue preclusion requires the Court to answer four questions: "(1) was there a final judgment on the merits in the prior adjudication; (2) was the party against whom estoppel is asserted a party (or in privity with a party) to the prior adjudication; (3) was the issue decided in the prior adjudication identical with the one presented in the action in question; and (4) was the issue decided in the prior adjudication essential to the judgment in the prior adjudication?" <u>Alba v. Raytheon Co.</u>, 441 Mass. 836, 842 (2004) (citation omitted). The party asserting preclusion bears the burden of establishing these requirements. <u>Alicea v. Commonwealth</u>, 466 Mass. 228, 236 (2013). Local 59 does not appear to dispute that the first and second requirements are met. <u>See</u> D. 47 at 5–8.

Local 59 argues that the MCAD's preemption decision was not essential to the final judgment in that case. D. 47 at 6–7. In <u>Jarosz v. Palmer</u>, 436 Mass. 526, 532–33 (2002), the Supreme Judicial Court determined that for the purpose of issue preclusion, an issue is "essential to the judgment" only if it is "essential to the underlying case . . . not merely essential to a determination of the narrow issue before the court at that time." <u>Id.</u> Local 59 is, therefore, correct that based upon the MCAD order, it appears "[t]he issue of preemption, as decided by the MCAD, was essential only to the MCAD's determination of whether Plaintiff's claims were preempted,

not to whether [Local 59] engaged in unlawful conduct." D. 47 at 6. Thus, "relitigation of [the] issue[] in a subsequent action between the parties is not precluded." Jarosz, 436 Mass. at 533 (quoting Restatement (Second) of Judgments § 27 cmt. h (1982)).

But even if the requirements for issue preclusion were otherwise satisfied, the preemption question before the MCAD appears to have been more limited than the preemption question before this Court. See D. 30-1; D. 47 at 7–8. The MCAD concluded that Garcia's claims that Local 59 had failed to "vigorously represent him throughout the grievance proceedings due to his national origin, race, and color" were not preempted by the LMRA. D. 30-1 at 1–5. Based upon the MCAD's order, it does not appear that the MCAD considered allegations regarding the use of racial slurs in the workplace, racially motivated route assignments, the delay of the union election or any claims concerning retaliation. See id. at 1–2. There was, therefore, no final judgment on the merits with respect to whether claims arising from these allegations are preempted by the LMRA. See Alba, 441 Mass. at 842. Thus, even if issue preclusion applied, its application with respect to any such claims would be inappropriate because Local 59 did not have a "full and fair opportunity to litigate the issue in the first action." Martin, 401 Mass. at 62.

## B.    Federal Question Jurisdiction Exists Because Garcia's Claims Are at Least in Part Preempted by the LMRA

"It is a federal court's obligation to assure itself of the existence of subject matter jurisdiction even if no party presses the question." BIW Deceived v. Loc. S6, Indus. Union of Marine & Shipbuilding Workers of Am., IAMAW Dist. Lodge 4, 132 F.3d 824, 828 (1st Cir. 1997). "[T]he artful pleading doctrine permits a district court to recharacterize a putative state-law claim as a federal claim when a review of the complaint, taken in context, reveals a colorable federal question within a field in which state law is completely preempted." Id. at 832.

"When resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim [] or dismissed as pre-empted by federal labor-contract law." Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220 (1985) (internal citation omitted). "This powerful preemption principle propels a significant exception to the well-pleaded complaint rule—the artful pleading doctrine." BIW Deceived, 132 F.3d at 831. According to this doctrine, courts "look beneath the face of the complaint to divine the underlying nature of a claim, to determine whether the plaintiff has sought to defeat removal by asserting a federal claim under state-law colors, and to act accordingly." Id. "Courts confronted with state law claims must . . . locate the line between the need for mere consultation of a CBA, which does not demand federal preemption, and more active interpretation of that agreement, which does preempt the state law claims." Fant v. New Eng. Power Serv. Co., 239 F.3d 8, 15 (1st Cir. 2001) (quoting Lydon v. Bos. Sand & Gravel Co., 175 F.3d 6, 10 (1st Cir. 1999)). "Federal subject-matter jurisdiction exists as long as—at the time of removal—there was a seemingly valid or genuine argument that adjudication of the plaintiff's claim would require construction of the CBA." Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 18 (1st Cir. 2018).

### 1.    Alleged Discriminatory Assignment of Driving Routes

Garcia's discrimination and retaliation claims against UPS and Local 59 arise in part from UPS's alleged discriminatory assignment of driving routes in minority neighborhoods to minority drivers. D. 1-1 ¶ 18. Driving routes were assigned through a bidding system established by the CBA, which means that to identify whether routes were assigned based upon an impermissible purpose, such as race, the Court would need to evaluate "which driver was qualified to bid for which type of route, their applicable seniority date, and whether they were bumped for any

permissible reason under the CBA."  D. 25 at 12; see D. 10-1 at 82–84; D. 10-2 at 15–31.  In Rose v. RTN Fed. Credit Union, 1 F.4th 56, 62–63 (1st Cir. 2021), the First Circuit concluded a wage claim was preempted because the applicable overtime rate could not be calculated without determining the pay rate under the CBA, which depended upon a variety factors.  Id.  Here, determining the propriety of the bid assignments requires analyzing seniority, driver classification and all the CBA's exceptions to driving assignments.  See D. 10-1 at 80–84; D. 10-2 at 15–31.  "[T]he fact-sensitive nature of the inquiry counsels persuasively in favor of analyzing the terms of the CBA."  Rose, 1 F.4th at 62; see Fant, 239 F.3d at 15 (observing that "questions relating to qualifications and seniority usually require recourse to details that are imbedded in CBAs"); Peele v. United Parcel Serv., Inc., No. 22-cv-1835, 2023 WL 2539012, at *2–3 (E.D. Pa. Mar. 16, 2023) (concluding state law claims arising from an alleged violation of the CBA's route-bidding procedure are preempted under the LMRA because their resolution requires analyzing the language of the CBA.  That Garcia's "state-law claims require interpretation of the CBA's [] provision[s] suffices to ground the application of LMRA preemption."  Rose, 1 F.4th at 62.

### 2.  Alleged Election Delay

Garcia's claim that Local 59 improperly delayed the local steward election is also preempted by the LMRA because it is, at its core, a claim that the union misapplied its own bylaws. D. 1-1 ¶¶ 18–30; see D. 31 at 15–16; D. 38 at 11–13.  The LMRA prescribes a duty of fair representation which obliges the union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."  BIW Deceived, 132 F.3d at 830 (citation omitted).  As alleged, the election delay would constitute arbitrary conduct in violation of this duty.  See D. 38 at 11–13.  As such, any claim arising from that delay is preempted by the LMRA.  See Rodgers v. Callaway Golf

Operations, Inc., 796 F. Supp. 2d 232, 239–40 (D. Mass. 2011) (concluding that plaintiff's c. 151B claim of race discrimination in the union's alleged violation of the duty of fair representation was preempted).

### 3.    Failure to Reinstate

Garcia's discrimination and retaliation claims against UPS and Local 59 also appear to arise in part from the grievance panel's decision not to reinstate him, despite reinstating a white employee who was disciplined for the same infraction. D. 1-1 ¶¶ 35, 44–48, 56–58. Garcia alleges that although at the panel hearing he "took responsibility for his conduct and apologized," the grievance panel cited a lack of remorse in upholding his termination. Id. ¶¶ 56–58.

The grievance panel is a body comprised of UPS employees and Local 59 members whose duty is to determine whether there has been a violation of the CBA. See D. 1-1 ¶ 46; D. 10-1 at 31–38; D. 10-2 at 9–10, 32. This Court, therefore, cannot determine whether the panel violated its duty without interpreting the CBA, which may reveal a legitimate basis for the panel's decision. See King v. United Parcel Serv., Inc., No. 23-cv-00069-RGE-WPK, 2023 WL 11197700, at *7 (S.D. Iowa May 5, 2023) (concluding an employee's claim that he was subject to disparate treatment when he alone was suspended following an event in which both he and a white employee participated was preempted by the LMRA because resolving the claim required interpreting CBA provisions permitting suspension for "just cause" to determine whether that standard was applied asymmetrically). To provide just one example, to resolve Garcia's claim, the Court would need to interpret whether Garcia committed a "cardinal infraction" under the CBA. See D. 10-1 at 29–30; D. 10-2 at 32; Peele, 2023 WL 2539012, at *2 (concluding a claim that required the court to determine whether the plaintiff committed a "cardinal infraction" was "substantially dependent

upon analysis of the terms in the collective bargaining agreement") (internal citation and quotation marks omitted).

Moreover, as UPS and Local 59 observe, the right to reinstatement "arises purely by contract, not law, and was obtained through collective bargaining by [Garcia's] Union." D. 31 at 17; see D. 38 at 7–8; D. 10-2 at 32. "Section 301 governs claims founded directly on rights created by collective-bargaining agreements." Caterpillar Inc. v. Williams, 482 U.S. 386, 394, 399 (1987) (observing that "[w]hen a plaintiff invokes a right created by a collective-bargaining agreement, the plaintiff has *chosen* to plead what we have held must be regarded as a federal claim, and removal is at the defendant's option") (emphasis in original); see Manning v. Bos. Med. Ctr. Corp., No. 09-cv-11724-RWZ, 2011 WL 864798, at *2 (D. Mass. Mar. 10, 2011). Accordingly, any claim related to the panel's failure to reinstate Garcia is preempted by the LMRA.

### 4. The LMRA Can Preempt State Anti-Discrimination Claims

Garcia argues that § 301 cannot preempt claims under state anti-discrimination statutes, D. 33 at 10–11,[3] but this Court and the First Circuit have repeatedly determined that it can. See, e.g., Fant, 239 F.3d at 16 (concluding a state law claim of discrimination "is preempted by § 301 of the LMRA because it requires interpretation of the CBA"); Cameron v. Idearc Media Corp., No. 08-cv-12010-LTS, 2011 WL 4054864, at *6–7 (D. Mass. Sept. 9, 2011) (same); Troconis v. Lucent Techs., Inc., 160 F. Supp. 2d 150, 156 (D. Mass. 2001) (same); Fish v. Marine Biological Lab'y, No. 05-cv-11619-RGS, 2005 WL 8176186, at *2 (D. Mass. Nov. 3, 2005) (same). The cases in

---

[3] To support this argument, Garcia alleges that the Supreme Court held in Lingle v. Norge Div. of Magic Chef, Inc. 486 U.S. 399, 412 (1988) that "§ 301 does not pre-empt state anti-discrimination laws." D. 33 at 10 (quoting Lingle, 486 U.S. at 412). But that is not Lingle's holding. Lingle, 486 U.S. at 403–13. Rather, the Lingle Court concluded that a distinction for antidiscrimination statutes is "unnecessary:" the relevant question for LMRA preemption is whether adjudication of the state law violation is "dependent upon the terms of the private contract." Id. at 412–13.

which discrimination claims are not preempted by the LMRA involve claims that do not require interpretation of a CBA and involve alleged violations of nonnegotiable rights conferred by state law.  See, e.g., Anderson v. First Student, Inc., No. 10-cv-11829, 2011 WL 3443503, at *2 (D. Mass. Aug. 8, 2011) (concluding a claim alleging retaliation for a mandated report of child abuse was not preempted by § 301, as "[n]othing about the legal character of this claim . . . rises or falls upon any of the parties' rights and obligations under the CBA"); LaRosa v. United Parcel Serv., Inc., 23 F. Supp. 2d 136, 144 (D. Mass. 1998) (rejecting an argument that "since [a] collective bargaining agreement incorporates state anti-discrimination laws, [plaintiff's] state law based anti-discrimination action is preempted by the LMRA"); Finland v. Verizon New Eng., No. 09-cv-10895-MLW, 2009 WL 10694490, at *1 (D. Mass. Nov. 9, 2009) (concluding that "[a]lthough deciding plaintiff's Chapter 151B claim may require reference to a collective bargaining agreement, it will not require interpretation of any such agreement").

### 5.    *Federal Questions Appear on the Face of Garcia's Complaint*

Garcia also argues that § 301 does not preempt state claims when the federal question is present only in a defense.  D. 30 at 6–9 (citing Caterpillar, 482 U.S. 386 at 388–99).  In Caterpillar, 482 U.S. at 398–99, the Supreme Court held that the presence of a federal question in an affirmative defense could not support jurisdiction.  Id.  Instead, "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint . . . a defendant cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law."  Id. at 392, 399.  But as established, Garcia's claims amount, at least in part, to allegations that UPS and Local 59 did not comply with the route bidding procedures in the CBA, Local 59 violated its duty of fair representation and the grievance panel misapplied the CBA.  These are, on their face, federal

questions, irrespective of any affirmative defenses the parties may raise.  D. 31 at 12–21; D. 46 at 1–3.

### C.    Garcia's LMRA Claims Are Not Timely

Section 10(b) of the LMRA sets a six-month statute of limitations for claims arising under § 301 of the Act.  29 U.S.C. § 160(b).  Because Garcia did not file the underlying lawsuit until January 23, 2024, more than two years after his termination was upheld in May 2021, judgment for UPS and Local 59 on Garcia's preempted claims is mandated.  See Adorno v. Crowley Towing & Transp. Co., 443 F.3d 122, 126–27 (1st Cir. 2006) (affirming that § 301 claims filed outside the six-month limitations period are time-barred); Arriaga–Zayas v. Int'l Ladies' Garment Workers' Union–P.R. Council, 835 F.2d 11, 13 (1st Cir. 1987) (explaining, in affirming dismissal of § 301 suit as time-barred, that "the aggrieved workers were bound . . . to sue within the six month limitations period or forever hold their peace"); Graham v. Bay State Gas Co., 779 F.2d 93, 94 (1st Cir. 1985) (affirming dismissal of § 301 suit as time-barred).  The Court, therefore, allows UPS and Local 59's motions to the extent that Garcia's claims arise from the alleged discriminatory assignment of driving routes, the alleged election delay or the panel's decision not to reinstate him.

### D.    Garcia's Remaining Claims Are Not Timely

Garcia's remaining allegations concern the use of racial slurs in the workplace and are not preempted by the LMRA because they do not require interpretation of the CBA, and UPS and Local 59 do not suggest otherwise.  See D. 31; D. 38; D. 46; D. 47.  Nevertheless, for a claim under Chapter 151B, the statute of limitations is three years after the alleged unlawful conduct.  Mass. Gen. L. c. 151B, § 9.  Garcia alleges one of his supervisors, Connors, used racial slurs on two separate occasions, and after Garcia reported these slurs to his Local 59 Representative, Belanger, he told him nothing would be done.  D. 1-1 ¶¶ 10–17.  But each of these incidents

appears to have taken place during Garcia's employment, which was terminated on December 8, 2020. See id. ¶¶ 10–17, 44. Because Garcia did not file the underlying lawsuit until January 23, 2024, more than three years later, to the extent that his discrimination and retaliation claims arise from these incidents, they are time barred. See D. 31 at 4–5; D. 46 at 5 n.4; D. 38 at 4–5; Goldstein v. Brigham & Women's Faulkner Hosp., Inc., 80 F. Supp. 3d 317, 324 (D. Mass. 2015) (concluding that a Chapter 151B claim was untimely because it was filed three years and five months after the alleged discriminatory conduct).

Contrary to Garcia's contention, the continuing violation doctrine does not save his claims. See D. 41 at 5–6. "The continuing violation doctrine is an equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is 'some violation within the statute of limitations period that anchors the earlier claims.'" O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001) (internal citation omitted). The continuing violation doctrine applies when: "(1) at least one discriminatory act occurred within the . . . limitations period; (2) the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts and (3) earlier violations outside the . . . limitations period did not trigger [the employee's] awareness and duty to assert [her] rights." Ocean Spray Cranberries, Inc. v. Mass. Comm'n Against Discrimination, 441 Mass. 632, 643 (2004) (internal citation and quotation marks omitted).

Garcia has failed to satisfy at least the third requirement, as he has not shown that he was unaware of the discrimination or unable to form a reasonable belief about the discrimination at the time that it occurred. See id. at 646–47. Even as alleged, Garcia was aware of the discrimination because he chose to report it both to a UPS manager and to his Local 59 representative. D. 1-1 ¶¶ 12–13; D. 47 at 8–9. In response, each allegedly indicated that nothing would be done. D. 1-1 ¶¶

12–13.  Thus, Garcia not only was aware of the allegedly discriminatory comments, but he also knew they would not be addressed.  See Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23, 35 (1st Cir. 2015) (observing that Massachusetts law does not impose the duty to bring suit until the plaintiff "has good reason to believe that her 'problems would [not] cease'" (alteration in original) (quoting Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 540 (2001))).  Accordingly, the Court concludes that the continuing violation doctrine does not save Garcia's discrimination and retaliation claims to the extent that they arise from the use of racial slurs in the workplace.

Similarly, even if Garcia's claims against UPS and Local 59 concerning racially motivated route assignments and his claims against Local 59 concerning its election delay were not preempted and therefore untimely under the LMRA, they would be untimely under Chapter 151B. As alleged, Garcia raised concerns that route assignments were racially motivated in 2020, more than three years prior to the date he filed his complaint.  See D. 1-1 ¶ 18.  The continuing violation doctrine cannot save these claims because Garcia alleges that when he raised these concerns, he "was aware that other UPS employees had previously raised the same concerns," id. ¶ 19, and, nevertheless, neither UPS nor Local 59 "sought to investigate or address said treatment," id. ¶ 20. As alleged, Garcia thus knew the route assignments were discriminatory and would not be addressed.  Shervin, 804 F. 3d at 35.  Likewise, Garcia alleges that the union election took place in October 2020, more than three years before Garcia filed this complaint.  D. 1-1 ¶ 28.  Nor are any claims concerning that delay saved by the continuing violation doctrine because even the allegations in the complaint indicate Garcia's awareness of the allegedly discriminatory delay in the election.  See id. ¶¶ 22-30; Ocean Spray Cranberries, Inc., 441 Mass. at 646–47.

**VI.    Conclusion**

For the foregoing reasons, the Court ALLOWS UPS and Local 59's motions for judgment on the pleadings, D. 31; D. 37.[4]

**So Ordered.**

/s Denise J. Casper
United States District Judge

---

[4] In light of the Court's ruling, the parties' joint motion to stay pretrial deadlines, D. 49, is DENIED as moot.